1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA,     :     CRIMINAL ACTION
                                        No. 18-10251-ADB-1
4        Plaintiff,               :

5              v.                 :

6   BYRON CARDOZO,                :

7        Defendant.               :

8   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

9                  BEFORE THE HONORABLE JUDITH G. DEIN,
                     UNITED STATES MAGISTRATE JUDGE
10                          **DETENTION HEARING**

11  APPEARANCES:

12  For the United States         United States Attorney's Office
    of America:                   BY:  AMY H. BURKART, AUSA
13                                1 Courthouse Way, Suite 9200
                                  Boston, MA  02110
14
                                  U. S. Department of Justice
15                                BY:  MONA SEDKY, ESQ.
                                  601 D Street, N.W.
16                                Washington, DC  20530

17
                                  U. S. District Court
18                                1 Courthouse Way
                                  Boston, Massachusetts  02210
19                                Friday, September 28, 2018
                                  11:19 a.m.
20

21  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
22  _____

23                    **JANICE RUSSELL TRANSCRIPTS**
                          **1418 Red Fox Circle**
24                       **Severance, CO  80550**
                           **(757) 422-9089**
25                     **trussell31@tdsmail.com**

1    APPEARANCES (continued):

2    For the Defendant:          Office of Federal Public Defender
                                 BY:   JANE F. PEACHY, ESQ.
3                                51 Sleeper Street, 5th Floor
                                 Boston, MA  02210
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2
                                Direct     Cross     Redirect
3   WITNESSES FOR THE
        GOVERNMENT:
4   Michael Fahey              6         42         62

5   WITNESSES FOR THE
        DEFENDANT:
6   Kevin Rickel              65

7

8

9   EXHIBITS:                                Marked      Received

10       US 1-12                              5           5

11       D 1-6                                5           5

12

13  ARGUMENT:       Ms. Sedky                             73

14                  Ms. Peachy                            81

15
    THE COURT:      Finding                               88
16

17

18

19

20

21

22

23

24

25

4

1                      P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  -- Massachusetts is now in

3    session on September 28th, the year 2018, in the matter of the

4    United States of America versus Byron Cardozo, Criminal Case

5    No. 2018-10251.

6              Could counsel please identify themselves for the

7    record?

8              MS. BURKART:  Good morning, your Honor.  Amy Burkart

9    for the United States with my colleague, Mona Sedky, from the

10   Department of Justice.

11             THE COURT:  Good morning.

12             MS. PEACHY:  Good morning.  Jane Peachy for

13   Mr. Cardozo.

14             THE COURT:  We're scheduled for a detention hearing.

15   Are we ready to proceed?

16             MS. PEACHY:  Yes, your Honor.

17             THE COURT:  Okay.

18             Government, call your first witness.

19             MS. SEDKY:  Thank you, your Honor.

20             We've spoken with defense counsel and we'd like to

21   move to introduce and admit our, I think we have 11 exhibits.

22             THE COURT:  No objection?

23             MS. PEACHY:  There are no objections, your Honor.

24             THE COURT:  All right.

25             MS. PEACHY:  And I've also submitted some object,

 1    exhibits to the Court.

 2         THE COURT:  Do you want to wait or do you want to --

 3    you want to enter them now or do you want to wait?

 4         MS. PEACHY:  I -- we can enter them now --

 5         THE COURT:  Okay.

 6         MS. PEACHY:  -- as long as there's no objection, your

 7    Honor.

 8         THE COURT:  No objection to them?

 9         MS. SEDKY:  We have no objection.

10         THE COURT:  All right.

11         So Government's Exhibits 1 through 12 -- I think -- 12

12    are admitted and Defense Exhibits 1 through 6 are admitted.

13       (Government's Exhibits 1 through 12 and Defense Exhibits 1

14    through 6 admitted in evidence)

15         THE COURT:  Okay.

16         MS. SEDKY:  Thank you, your Honor.

17         THE COURT:  Go ahead.

18         MS. SEDKY:  The Government would like to call Special

19    Agent Michael Fahey to the stand.

20         THE COURTROOM DEPUTY:  Please raise your right hand.

21          MICHAEL FAHEY, GOVERNMENT'S WITNESS, SWORN

22         THE COURTROOM DEPUTY:  Please be seated.  Please state

23    your full name, spelling your last name for the record.

24         THE WITNESS:  Michael Fahey, F-A-H-E-Y.

25         THE COURT:  You may proceed.

1                        DIRECT EXAMINATION

2    BY MS. SEDKY:

3    Q    Good morning, Special Agent Fahey.

4         Could you tell us, where do you work?

5    A    I'm a special agent with the Department of Homeland

6    Security's Federal Protective Service currently assigned as a

7    Task Force officer to the FBI's Cybercrimes Task Force.

8    Q    As a Task Force officer at the FBI in the Cybercrimes Task

9    Force, what kind of work do you do there?

10   A    We conduct investigations into cyber-related criminal

11   activities like, such as computer intrusions, cyberstalking,

12   ransomware, phishing.

13   Q    And how long have you been a Task Force officer?

14   A    One year.

15   Q    And how long were you with the Federal Protection Service

16   before that?

17   A    Just about 22 years.

18   Q    And in your 22 years at the FPS what kind of work were you

19   doing?

20   A    I worked as a dispatcher initially, worked four years in

21   uniform, and I've been a special agent and criminal

22   investigator since 2002.

23   Q    What types of crimes were you investigating?

24   A    We handle crimes against government facilities and

25   government employees.  It can be threats, assaults, larcenies.

1   Q    Okay.

2        And what's your role in the investigation of the defendant,

3   Byron Cardozo?

4   A    I'm aware of some of the documentation and I've spoken to

5   the case agent.

6   Q    Fair to say you're not the primary case agent?

7   A    I am not.

8   Q    And have you had an opportunity to review any items in the

9   case file?

10  A    I have.

11  Q    And tell us, big picture, what have you reviewed?

12  A    I reviewed police reports, criminal histories, interview

13  summaries.  I've reviewed messages that were received by

14  victims.  I've reviewed court orders.  Yeah.

15  Q    Okay.  Describe generally, if you could, what is the

16  offense conduct that's set forth in the indictment in this

17  case.

18  A    Cyberstalking and interstate threats.

19  Q    And approximately during what time period and, big picture,

20  what were the threats about?

21  A    Roughly, from February 2017 until August of 2018.  There

22  were hundreds of electronic communications of a threatening and

23  harassing nature delivered through multiple, multiple social

24  media and communication methods.

25  Q    Okay.  And was there any primary recipient of the threats?

1   A    There was.

2   Q    And do you know who that person is?

3   A    I do.

4   Q    How is she referred in the indictment?

5   A    Jane Doe No. 1.

6   Q    Okay.  So you know her true identity.

7        How old is she, approximately?

8   A    Thirty years old.

9   Q    Do you know where she lives?

10  A    Massachusetts.

11  Q    Okay.  And what type of work does she do?

12  A    She's a photographer and writer.

13  Q    Where did she grow up?

14  A    Florida.

15  Q    And what, if any, connection does she have with

16  Mr. Cardozo?

17  A    They attended the same middle school-high school at the

18  same time.

19  Q    And who was in middle school and who was in high school?

20  A    She was a middle school student and he was in high school.

21  Q    And did they ever meet in person?

22  A    They did.

23  Q    Tell us about that.

24  A    There was an occasion where they had been communicating

25  online predominantly for a short period of time and he invited

1   her to meet at a mall.

2       So she went to the mall, got dropped off.  Met him there.

3   He asked her to walk with him out to his vehicle in the parking

4   lot, which she did.  When she arrived at his vehicle there was

5   another male occupant of the vehicle.  The three proceeded to

6   engage in a sexual encounter and then they went their separate

7   ways.

8   Q   Do you know approximately what year this sexual encounter

9   was?

10  A   2001.

11  Q   And do you remember approximately how old Jane Doe 1 was at

12  the time?

13  A   She was approximately 13.

14  Q   And how old approximately was Mr. Cardozo at the time?

15  A   Seventeen.

16  Q   And do you know the other, without saying his name, do you

17  know the identity of the other male in the car?

18  A   Yes.

19  Q   And approximately how old was he?

20  A   Seventeen as well.

21  Q   And what, if any, connection did he have with Mr. Cardozo?

22  A   They were classmates in high school.

23  Q   And --

24  BY THE COURT:

25  Q   Was this in Florida?

1   A   Yes.

2   BY MS. SEDKY:

3   Q   You said that at the time Jane Doe 1 was in middle school

4   and Mr. Cardozo was in high school.  How did that come about if

5   they were in different schools?  How did they know each other?

6   A   The school shared a campus.  So the middle school and high

7   school were on the same campus and Jane Doe 1 had a friend who

8   was also friends with Mr. Cardozo.

9   Q   And describe the sexual encounter in a little bit more

10  detail, please.  What happened?

11  A   Sure.

12      Jane Doe 1 performed oral sex on both Mr. Cardozo as well

13  as the other male.

14  Q   Okay.  And how did Jane Doe 1 describe this encounter?

15  A   She described it as traumatic, force, as a, like a, an

16  uncomfortable experience.

17  Q   Did she ever call the police?

18  A   She did not.

19  Q   Okay.

20      And you mentioned that there was another friend of Jane Doe

21  2's that had a connection with Mr. Cardozo.  Are you aware of

22  the identity of, we'll call her Jane Doe 2?

23  A   I am.

24  Q   And has the FBI interviewed her as well?

25  A   They have.

1   Q    And where does she live?

2   A    She lives in Massachusetts.

3   Q    And approximately how old is she?

4   A    Approximately 30 years old.

5   Q    So she was, essentially, Jane Doe 1's same age?

6   A    Yes.

7   Q    Also in middle school?

8   A    Yep.

9   Q    And how did she describe, if, if at all, her relationship

10  with Mr. Cardozo?

11  A    They had a dating relationship around the same period of

12  time, the 2001 time frame.

13  Q    And when you say "dating," can you be more specific?

14  A    It was a sexual relationship between her and Mr. Cardozo.

15  Q    Okay.

16       So I want to take your attention to the time period of 2001

17  to 2015.  So after the 2001 sexual encounter through 2015.

18  What, if any, contact was there between Mr. Cardozo and Jane

19  Doe 1?

20  A    He would reach out periodically through Facebook to try to

21  reconnect with her.  She would ignore those messages.  She

22  would block the accounts he was reaching out to her on.  He

23  would create additional accounts, reach out to her again.

24  Q    Okay.  And at some point did Jane Doe 1 respond to one of

25  Mr. Cardozo's Facebook messages?

1   A    She did.

2   Q    And tell us about that.

3   A    She was in the position like where she was contemplating

4   the, the sexual encounter back in high school and she wanted to

5   talk to him about his, his view on the, the incident.

6        So she needed to reach out and respond to one of his

7   messages.

8   Q    Do you remember approximately when this was?

9   A    That was in the beginning of 2016.

10  Q    Okay.  And in the course of this Facebook message what does

11  she, what does she do?  What does she say and how does he

12  respond?

13  A    She says that, you know, she's been thinking about this

14  interaction.  She felt it was forced and uncomfortable and

15  traumatic and she wanted to know what his, how he felt about

16  it.

17       He expressed -- he apologized and, you know, apologized to

18  her for whatever, you know, harm he caused her.

19  Q    And did she have any plans to do anything with the

20  information?

21  A    She did.  She also asked -- she explained to him that she

22  was considering writing an essay about the incident and she

23  asked his permission to write that essay, which he granted

24  under the conditions that pseudonyms would be used for the, the

25  parties involved.

1  Q    Okay.

2       So moving ahead, taking your attention to December 2016, or

3  thereabout, what happened next?

4  A    She published an essay on an online magazine which detailed

5  the incident that occurred at the mall.

6  Q    And how does she describe the incident in her essay?

7  A    As a traumatic and negative forced experience.

8  Q    Did she use the term "rape"?

9  A    No.

10 Q    Did she use the term "sexual assault"?

11 A    No.

12 Q    Did she use her real name when she published it?

13 A    She did.

14 Q    And did she use the other parties' real names?

15 A    She did not.

16 Q    Do you know which pseudonym she used for each of the

17 parties involved?

18 A    I do.

19 Q    Who was, who was Mr. Cardozo?

20 A    Chad.

21 Q    And who was the other male who was Mr. Cardozo's friend in

22 the car?

23 A    Gil.

24 Q    And who was Jane Doe 2?

25 A    Beth.

1    Q    Okay.

2         So one -- so one --

3              MS. SEDKY:  Did you have a question, your Honor?

4              THE COURT:   (No audible response.)

5              MS. SEDKY:  Okay.  Sorry.

6    BY MS. SEDKY:

7    Q    I want to --

8              THE COURT:  Well, I do, now that you paused.

9    BY THE COURT:

10   Q    But Jane Doe 2 was the friend?

11   A    Yes, your Honor.

12   Q    Is the other, the female friend?  Okay.

13   BY MS. SEDKY:

14   Q    I want to direct your attention to the February 2017 time

15   frame after the essay was published.

16        What happened next?

17   A    She immediately started receiving harassing and threatening

18   messages from Mr. Cardozo.

19   Q    How long did they last?

20   A    Right up until about August of 2018.

21   Q    When was he arrested, Mr. Cardozo?

22   A    August of 2018.

23   Q    Okay.  And approximately -- you testified earlier --

24   approximately how many communications are we talking about?

25   A    There were hundreds.

1  Q   And you said there were multiple methods.  Could you

2  describe a few of those for us?

3  A   Yeah.  She received messages on Facebook, on Twitter.

4  There were messages posted in the Comments section of the

5  online magazine where the essay was published as well as

6  comments posted, messages posted in the Comments section of

7  Jane Doe 1's own website.

8  Q   And was there a primary method of communication of the ones

9  that you've just listed?

10 A   It was the comments posted on the online magazine where the

11 essay was published.

12 Q   And is it -- have you had an opportunity to look at any of

13 these communications, the, the comments?

14 A   I have.

15 Q   Are they publicly viewable, or were they publicly viewable

16 at the time, if you know?

17 A   I'm not sure.

18 Q   Okay.

19     What names was he -- well, let me step back.

20     In addition to posting communications on the, on the

21 various Comments and communicating through Facebook and Twitter

22 with Jane Doe 1, did he communicate about Jane Doe 1 to anyone

23 else associated with Jane Doe 1?

24 A   He did.  He reached out to professional associates of hers.

25 Q   And what names was he using, typically, during his

1  communications?

2  A    They would be derivatives of the pseudonyms used in the

3  essay.   There was Chad Chaddington.   There was Gil, Gilbert

4  Gillington.

5  Q    Any others that you think, can think of?

6  A    He, he also used the, the true name of the second party

7  that was in the vehicle involved in the, the incident.

8  Q    Okay.   And in the course of reviewing these voluminous

9  communications were there any recurring themes that, that you

10  noticed in reviewing them?

11  A    There were.   Mr. Cardozo made posts ranging from

12  apologizing for his behavior to accusing Jane Doe No. 1 of

13  fabricating the story, lying, seeking attention.   He would

14  provide his description of the sexual encounter in graphic

15  detail as well as his sexual encounters with Jane Doe No. 2.

16  He would make comments about suicide.   Yeah.

17  Q    Whose suicide?

18  A    His own.

19  Q    Did he, did he describe any of his own sexual

20  gratification?

21  A    He did.   He would make comments about masturbating to Jane

22  Doe No. 1's story as well as pictures on the Internet.

23  Q    Any other recurring things that you can think of?

24  A    None that I can think of.

25  Q    Did he talk about Jane Doe 1's sexual orientation?

1  A    He did.   He -- he -- there was a post where he questioned

2  whether or not the sexual encounter caused her to become a

3  homosexual.

4  Q    And what about the threats you talked about earlier?

5  A    Uh-huh (indicating an affirmative response).

6  Q    Do you remember anything specific?   And I'll show you some

7  examples in a moment.

8  Q    I do.   He, he made comments that he would treat, show her

9  what an assault really was.   He made comments that indicated he

10  was -- there was -- he was intending to assault.

11  Q    Okay.

12      I'd like to direct your attention to what's been marked as

13  Exhibit No. 1.   It's an April 13, 2018 posting under the online

14  magazine, Guernica.

15  A    Uh-huh (indicating an affirmative response).

16  Q    Could you just read for us, please, the -- who is the

17  author listed in these, these three comments?

18  A    Gilbert Gillington, III.

19  Q    Okay.   And could you just please read -- they're each about

20  a sentence -- could you please read them?

21  A    Certainly.   (Reading):

22      "Best believe I'll never forget this ever for the rest of

23  your sad, fucking homosexual, lying life.   I'll fucking haunt

24  you, bitch.   I'll never go away.   You'll always have to look

25  over your scared shoulder.   Ha, ha, ha, ha.   You fucking lied

1   about me and then tried to have me arrested.  Fuck you, you

2   fucking cunt.  Till the day I die"  -- "Till the day I dae,

3   I'll fucking remind you what a lying piece of fucking shit you

4   are, blank fucker blank."

5   Q   Okay.  And that was her name --

6   A   Correct.

7   Q   -- in the blanks?

8       I'd like to direct your attention to what's been marked as

9   Exhibit 2.  And this is a May 21, 2018 post to the Comments.

10      And let me just step back.  Where, where was Exhibit 2

11  posted?  Where were these comments?

12  A   These were the ones that were posted -- once the Comments

13  section on the online magazine was closed, the, the postings

14  began, began appearing on her, Jane Doe 1's, website.

15      So this is a posting from her website.

16  Q   And without saying the name out loud, do you recognize the,

17  the, the name that is put in there for the, the name of the, of

18  who, who made the post?

19  A   I did, yep.

20  Q   And without saying the name out loud, who is that?

21  A   It was the second occupant of the vehicle involved in the

22  sexual incident.

23  Q   Okay.

24      And so could you please read these, I believe it's four

25  pages?

1   A    Uh-huh (indicating an affirmative response).  (Reading):

2        "You fucking bitch.  Keep it up and you will know what it

3   means to be assaulted.  You will fucking find out what happens

4   when you cry wolf, bitch.  You are fucking done.  I dare you to

5   keep pulling this shit.  I fucking dare you, bitch.  You will

6   know fear, trust me.  By the time this shit is over, you'll be

7   wishing you just ignored it."

8   Q    And I'd like to direct your attention to what's been marked

9   as Exhibit No. 3.  This is a July 10, 2018 posting also on Jane

10  Doe 1's personal website.

11       This name, directing your attention to the, to the name

12  part of Exhibit 1, without reading that name aloud, do you

13  recognize the name of the sender, the supposed poster?

14       Oh, you probably can't read it, can you?

15  A    No.  It's redacted on the --

16            MS. SEDKY:  Your Honor, may I approach the witness?  I

17  have one that he can probably look --

18            THE COURT:  Yes.

19            MS. SEDKY:  -- through that's not redacted.

20  BY MS. SEDKY:

21  Q    It's chicken scratching, I know, but -- (counsel shows

22  document to the witness.)

23  A    Yeah.

24  Q    Okay.  Do you recognize the name of the poster?

25  A    I do.  That would be Jane Doe No. 1.

1    Q    Her first and last name?

2    A    Correct.

3    Q    And could you please read Exhibit No. 3?

4    BY THE COURT:

5    Q    So who's the sender here?

6    A    The sender -- the name provided for the sender is Jane Doe

7    No. 1's own name.

8    Q    Oh.  Okay.

9    BY MS. SEDKY:

10   Q    And the actual e-mail account where it says @liarmail.com,

11   does Jane Doe No. 1's name appear before the @liarmail.com?

12   A    I didn't look at it when you brought it up.

13   Q    Okay.

14            THE COURT:  I'm going to -- well, go ahead.

15            THE WITNESS:  Okay.

16            It does.

17   BY MS. SEDKY:

18   Q    Okay.  And could you please read the few sentences we have

19   on July 10th?

20   A    (Reading):

21      "Well, I have fucking $8,000 worth of surgery to my right

22   eye, which was destroyed by you, you fucking evil bitch.  Hear

23   me now," blank.  "I will devote my miserable life to destroying

24   yours for what you have don't, you sick godless bitch.  You

25   have terrorized my mother's life and my father's life.  I won't

1  sleep until you are exposed for the soulless cunt you truly

2  are, you sick fuck.  You think two hired thugs, fucks, can stop

3  me from giving you what you deserve?  I fucking hope you try to

4  do something again, you delusional pathetic parasite.  Writer,

5  photographer, and amateur magician and bitch full of shit, I

6  hope you send Seal Team 6 to kill me because you have no idea

7  who you have just fucked with, little girl."

8  Q   Okay.  Is it -- let me just --

9      Over these 18 months -- you testified earlier that there

10 were hundreds of communications over the course of about 18

11 months.  How, if at all, did Jane Doe respond to these?

12 A   She -- to the messages?  She would ignore them.  She would

13 not respond to the messages.  In her personal life, she sought

14 assistance from a private attorney.  In the beginning of 2017,

15 a cease and desist order was sent to Mr. Cardozo.  In April of

16 2017, a, an injunction was granted, a protection order --

17 Q   And I'd like to --

18 A   -- preventing Mr. --

19 Q   -- pause you there and just show you what's been marked as

20 Exhibit No. 4.  (Counsel shows exhibit to the witness.)

21 A   Uh-huh (indicating an affirmative response).

22 Q   Is this the, the final Judgment of Injunction for

23 Protection that Jane Doe 1 had entered against Mr. Cardozo?

24 A    It is.

25 Q   And the date is April 24, 2017?

1    A    It is.

2    Q    I want to draw your attention to the second page where it

3    spells out the terms of the injunction.  Can you describe for

4    the Court what types of behavior are enjoined?

5    A    Yep.

6         The prohibited actions include stalking, cyberstalking,

7    aggravated stalking, any criminal offense resulting in physical

8    injury or death.

9    Q    What does No. 2 say?

10   A    (Reading)

11        "Respondent shall have no contact with petitioner unless

12   otherwise provided in this section."

13   Q    And does (a), sub (a), spell out the types of contact he's

14   not allowed to have?

15   A    It does.

16   Q    And what does that include?

17   A    (Reading):

18        "Respondent shall not directly or indirectly contact

19   petitioner in person, by mail, e-mail, fax, telephone, through

20   another person, or in any other manner, including any

21   electronic means or use of social media."

22   Q    And I'd like to direct your attention to the next page,

23   Paragraph 3(b), like "boy."

24   A    Uh-huh (indicating an affirmative response).

25   Q    What does that prohibit?

1   A    (Reading):

2        "Respondent shall not use or possess a firearm or

3   ammunition."

4   Q    Okay.

5        So what else did Jane Doe do, if anything, to protect

6   herself?

7   A    Uh-huh (indicating an affirmative response).

8        At one time she had to travel to Florida to attend a

9   conference and she felt the need to hire personal protection.

10  She hired a private investigator to provide her with a

11  bodyguard service during the time of that convention.

12       In addition, she was aware that Mr. Cardozo had a, the

13  terms of his community confinement were expiring.  She knew

14  that time frame was coming up and she agreed to allow a private

15  investigator to be hired to conduct surveillance of

16  Mr. Cardozo.

17  Q    Well, let me step back.  I'm just trying to go

18  chronologically.

19  A    Oh, certainly.

20  Q    So she gets the April 2017 --

21  A    Uh-huh (indicating an affirmative response).

22  Q    -- protection order.  And at some point do her attorneys

23  reach out on her behalf to, to people in the legal sphere?

24  A    They do.  They, they reach out to Mr. Cardozo's probation

25  officer.

1    Q    Okay.

2         And is that February -- I'm sorry -- April 2017 final

3    judgment still in place right now?

4    A    It is.

5    Q    How does -- how, if at all, does Mr. Cardozo respond to

6    Jane Doe 1's attempt to protect herself?

7    A    He just continues to message her.  He -- some of the

8    messages, you know, state that he intends to continue to

9    contact her and she can try whatever she can try, but it's not

10   going to stop him.

11   Q    Does he seem happy?

12   A    No.  He's angry.

13   Q    And do things decelerate or accelerate?

14   A    No.  It, it gets worse.  The, the messages increase in

15   anger and tone and frequency.

16   Q    And you were testifying earlier -- I want to take you to

17   the June 2018 time frame.

18   A    Uh-huh (indicating an affirmative response).

19   Q    Is there any significance to the June 2018 time frame?

20   A    Yeah.  That's when his community confinement was expiring

21   and, you know, Jane Doe No. 1 agreed to allow a family member

22   to hire a private investigator to conduct surveillance of

23   Mr. Cardozo to inform the family if it appears he's making any

24   attempts to travel.

25   Q    And was there a confrontation between the private

1   investigators and Mr. Cardozo in which Mr. Cardozo was injured?

2   A    There was.

3   Q    And is it -- when -- is it -- when did the FBI learn about

4   this confrontation between the private investigators and

5   Mr. Cardozo?

6   A    After the confrontation occurred.

7   Q    And did the FBI have an opportunity to ask Jane Doe 1 about

8   the confrontation?

9   A    They did.

10  Q    And what, if anything, did she say about her involvement in

11  it?

12  A    She -- that, that was not an expected result of hiring the

13  private investigator.  The private investigator was simply

14  hired to conduct surveillance and not ordered or advised in any

15  way to contact Mr. Cardozo directly.

16  Q    Are you aware if there is any state or local criminal

17  investigation into the private investigators?

18  A    There is.

19  Q    And does the FBI play any role at all in that state or

20  local investigation?

21  A    No.

22  Q    Okay.  And how did Mr. Cardozo, if at all, respond to this

23  incident in June of 2018?

24  A    That included the messages that I previously read about the

25  injuries to the eye.

1  Q    So Exhibit 4, in particular?

2  A    Uh-huh (indicating an affirmative response).

3  Q    Or, actually, I believe it's Exhibit 3, the July 10,

4  2018 --

5  A    Correct.

6  Q    -- messages.  Those were in response to the, to the

7  confrontation with the private investigator?

8  A    Correct.

9  Q    Okay.

10      In the course of interviewing Jane Doe 1 did Jane Doe 1

11  describe any emotional or behavioral impacts this has had on

12  her?

13  A    Yeah.  She advised that in about the ninth grade she was

14  diagnosed with post traumatic stress.  She's sought mental

15  health counseling on a weekly basis at periods in her life.

16  She's felt a need to restrict her online presence, closing down

17  accounts, limiting people who can view her accounts.  She's

18  felt a need to advise people in her professional life of

19  Mr. Cardozo, who he is, her history, and risk that he poses to

20  her.

21  Q    Okay.

22      I want to turn your attention to how it was the FBI was

23  able to determine who was responsible for sending these various

24  communications to, to Jane Doe 1 and others.

25      Did, did Mr. Cardozo try to hide his identity in ways other

1  than you testified earlier using these Chad and Gil and the

2  first name and last name of the other male in the car's --

3  A    Uh-huh (indicating an affirmative response).

4  Q    -- identity?  Did he do anything else to try to hide his

5  identity?

6  A    He did.  The FBI was able to determine that some of the

7  postings came through a virtual private network service.

8  Q    What's a virtual private network service?

9  A    It's, it's a gateway service where a user of the Internet

10  reaches out to the virtual private network first and then their

11  communications through the Internet occur from that point out.

12       So anyone out on the Internet who's trying to see who's

13  reaching out and making these communications can only get as

14  far back as the virtual private network.  They can't see the,

15  the true originator of the communications.

16  Q    So it's -- is it sort of like tunneling through something?

17  A    Yep, uh-huh.

18  Q    And is there a specific piece of information, an, an

19  address or some information that, that is trying to be

20  obfuscated through a virtual private network?

21  A    It's the IP address, yeah.

22  Q    Okay.  And so which one did the poster of these

23  communications use, which VPN service?

24  A    It was called Express VPN.

25  Q    Okay.  And what type of information was the online magazine

1   collecting about the person who, the identity of the person who

2   was posting the comments?

3   A   It would include the name, an e-mail address, and an IP

4   address.

5   Q   And what, if anything, did the FBI determine about many of

6   the IP addresses that were seen in these posts?

7   A   Many of the IP addresses came back to Express VPN.

8   Q   And I want to direct your attention to the April 2018 time

9   frame.

10      Was there a comment post in particular that the FBI was

11  able to trace to a particular person not using a VPN?

12  A   Yeah.  I, I don't recall the specific date.

13  Q   I'd like to turn your attention to Exhibit No. 5.

14  A   Uh-huh (indicating an affirmative response).

15  Q   And in the middle of that page there's an April 14, 2018

16  posting.

17  A   Okay.

18  Q   Who's the author identified in that posting?

19  A   Gilbert Gillington, III.

20  Q   And could you read the IP address?

21  A   Sure.  It's 45.27.239.102.

22  Q   And does it identify the Internet service provider that is

23  responsible for that IP address?

24  A   It does.  It's listed as SBC Global.net.

25  Q   And was the FBI able to obtain records from SBC Global.net?

1    A    They were.

2    Q    And what did they determine, if anything, about who the

3    subscriber was on April 14, 2018?

4    A    That -- the subscriber to that IP address on that date was

5    Mr. Cardozo's mother.

6    Q    What's her name?

7    A    Deborah.

8    Q    Deborah Cardozo?

9    A    Correct.

10   Q    And where -- did they have an address in the subscriber

11   records?

12   A    I believe they did, yes.

13   Q    And anything significant about that address?

14   A    It was the address that Mr. Cardozo was currently living

15   at.

16   Q    And did the FBI do anything else to connect the dots

17   between Mr. Cardozo and these various communications, big

18   picture?

19   A    Yep.

20   Q    Tell us some other things.

21   A    There were times when the IP addresses that were making the

22   posts were the same IP addresses that were simultaneously

23   accessing Mr. Cardozo's known social medial accounts such as

24   Facebook.

25   Q    Okay.

1     What about the content of these communications?  Was there

2  anything about just sort of reading the content and the timing

3  that seemed significant?

4  A    Yeah.  The content of the, the messages seemed to indicate

5  that the, the writer was the person that the, the essay was,

6  was referring to.

7  Q    And to your knowledge, has Jane Doe 1 received any

8  communications from Mr. Cardozo or, or anything like this since

9  Mr. Cardozo has been in custody since his arrest?

10  A    Not to my knowledge.

11  Q    I want to turn your attention to Jane Doe 2, who you talked

12  about earlier.

13     Where did she grow up?

14  A    Florida.

15  Q    And has she received any communications from Mr. Cardozo

16  over the years?

17  A    She has.

18  Q    Tell us about those.

19  A    Similar to Jane Doe No. 1, she would receive periodic

20  communications from Mr. Cardozo from Facebook trying to

21  reconnect and re-establish their relationship.

22  Q    Did he try any other methods other than Facebook?

23  A    He sent a handwritten letter at one point.

24  Q    Anything else?

25  A    Not that I can recall.

1    Q    Okay.  And was he using his own names, typically --

2    A    Uh-huh (indicating an affirmative response).

3    Q    -- his own name, typically?

4    A    He was.

5    Q    And I want to direct your attention to -- well, before I

6    show you Exhibit No. 6 -- big picture, what were some of the

7    topics of these periodic communications over the course of how

8    many years?

9    A    Approximately 15 years.

10   Q    Okay.  What's he saying?

11   A    Apologizing for the way he treated her, expressing his

12   undying affection for her, and a desire to get back into her

13   life.

14   Q    Okay.

15        I'd like to show you what's been marked as Exhibit No. 6,

16   which is a Facebook conversation between Jane Doe 2 and

17   Mr. Cardozo and marked as July of 2017.  (Counsel shows exhibit

18   to the witness.)

19        And I want you to go -- I'd like to direct your attention

20   to Page 2 where it starts with the, "You promised me."

21   A    Uh-huh (indicating an affirmative response).

22   Q    Could you just indulge us and read all of the -- the -- the

23   -- I guess they're color coded --

24   A    Okay.

25   Q    -- sections on this page?

1   And who's the speaker?

2   A    This would be Jane Doe No. 2.

3   Q    Okay.

4   A    She wrote:

5       "You promised me you would stop doing this.  You broke that

6   promise.  Please stop for the last time.  I do not have any

7   feelings for you and you continue under false names to harass

8   me to the point where I am forced to respond.  That is not love

9   on your part.  I do not have any ill feelings towards you

10  except when you continue this and it is only this that has made

11  me feel any.  I do not want to experience this, again.  You

12  have scared me enough.  You do not accept no for an answer,

13  ever.  That is abuse.  Do not contact me again."

14  Q    And then moving ahead, there's more, but I'm just going to

15  have you skip to the, to the next page, Page 3 of this exhibit,

16  beginning with the, "You know I was thinking."

17  A    Uh-huh (indicating an affirmative response).

18  Q    Who is speaking here?  And could you please read the next

19  three entries?

20  A    Certainly.  This is Mr. Cardozo.  (Reading):

21      "You know I was thinking back to when I had said everything

22  that needed to said and was ready to move on and then you

23  retaliated by putting a restraining order on me. LOL.  You

24  created this situation.  Blame me all you want, but you know

25  it's true, LOL, and it just feels so good to tell you how I

1   really feel.  The cops called me out of nowhere and said I was

2   harassing you when I clearly remember blocking you.  I even

3   told him that.  'You blocked her,' he said in a confused tone.

4   'Yes, so I have no idea why she is calling for a restraining

5   order.'  You fucked up my life even worse than it already had

6   been.  I had cops stalking me for days, pounding on my door at

7   all hours.  So fuck you.  'I do not want to experience this,

8   again.  You have scared me enough.'  Ha, ha."  That was in

9   quotes.  "Ha, ha, ha, ha, ha.  Shit, don't make me laugh.  I

10  could care less about you ill feelings towards me, you soulless

11  husk.  You fucking deserve everything I have done and worse.

12  Now cry and feel sorry for yourself.  'Scared' of nothing I

13  will, I will ever do to you, fool."

14  Q   And let's just -- it's more of the same -- but please skip

15  back down to the last entry --

16  A   Uh-huh (indicating an affirmative response).

17  Q   -- on that page.

18  A   The one that begins with "Also"?

19  Q   Yes, please.

20  A   (Reading):

21      "Also, let's get the satanic, abusive, oppressive,

22  murdering-people-every-day police involved again because that

23  worked so fucking well last time, did it not?"  And there's a

24  link to an article concerning a police officer who shot a

25  subject named Alton Sterling.

1    Q    Okay.

2         What does -- what, if anything, does Jane Doe 2 do to

3    respond?   I mean -- actually, let's strike that.   It's sort of

4    self-referential in there.

5         I want to turn your attention to another restraining order.

6    Are you aware of any other restraining orders?   We talked about

7    Jane Doe 1 --

8    A    Yep.

9    Q    -- Jane Doe 2.

10   A    I am.

11   Q    Tell us about that.

12   A    This would be a minor party referred to as Jane Doe 3.

13   Q    Are you aware of her true identity?

14   A    I am.

15   Q    Where does she live?

16   A    Florida.

17   Q    And how does she know -- have you -- has the FBI had an

18   opportunity to interview Jane Doe 3?

19   A    They have.

20   Q    And any of her family members?

21   A    Yes.

22   Q    Who?

23   A    Her father and her mother.

24   Q    Okay.   And what, if any, connection did she have to

25   Mr. Cardozo?

1   A   They were coworkers at a fast food restaurant.

2   Q   Where?

3   A   In Florida.

4   Q   For how long?

5   A   I'm not sure of the extent of when they worked together.

6   Q   Years?

7   A   No.  It was months.

8   Q   Okay.  Would it be around a month?  Does that sound --

9   A   Yeah, yep.

10  Q   -- accurate?

11      And approximately what time are we talking about?

12  A   This would be 2017, I believe.

13  Q   Could be early -- could it -- could it be late 2016?

14  A   Yes.

15  Q   I'll show you some exhibits --

16  A   Yep.

17  Q   -- if it'll help.

18      And how old was she at the time?

19  A   She was 17 at the time.

20  Q   And how old was Mr. Cardozo?

21  A   He would have been approximately 30.

22  Q   And how did Jane Doe 3 describe the attention she was

23  receiving early on from Mr. Cardozo?

24  A   She felt it was uncomfortable and excessive.  He was paying

25  a lot of attention to her like sexually interested.

1  Q    Okay.  And who actually -- well, have you had an

2  opportunity to, to review any of the, the filings in connection

3  with the protective order?

4  A    I have.

5  Q    I want to draw your attention to what's been marked as

6  Exhibit No. 7.  This is the Petition for Injunction for

7  Protection Against Repeat Violence against Mr. Cardozo filed

8  November 4, 2016?

9  A    Uh-huh (indicating an affirmative response).

10 Q    And is this Jane Doe 3 whose name is -- or it's actually --

11 is it Jane Doe 3 or is it a family member?

12 A    The, the petition was filed by her mother on her behalf

13 because she was a minor.

14 Q    And what, what happened?  What led to this injunction?

15 A    There were multiple instances at work where Mr. Cardozo

16 would physically assault Jane Doe No. 3.  There was an instance

17 where she was standing at the cash register and he pushed her

18 out of the way.  That was observed by multiple other parties,

19 including the restaurant manager.

20     There was an instance where he was in the back peeling

21 potatoes, told her to get away from him or he was going to hit

22 her, and he proceeded to throw the potato peeler at her.

23     There was an instance where she was speaking to a manager

24 and he approached her and grabbed her wrist and wouldn't let go

25 to the point that it caused bruising.  And she reported that

1  instance to the local police and management sent Mr. Cardozo

2  home that day.

3  Q   Did anybody in her, in Jane Doe 3's family also work at the

4  restaurant?

5  A   Her mother worked there.

6  Q   Okay.  And what was Jane Doe 3 and her mother's response to

7  this?  Is that what led to the petition?

8  A   Yes, correct.

9  Q   Did they ultimately successfully obtain a permanent

10  injunction?

11  A   They did.

12  Q   I want to turn your attention to what's been marked as

13  Exhibit 8, which is the November 15, 2016 Final Judgment of

14  Injunction for Protection Against Repeat Violence.

15      What are the terms of this injunction?

16  A   These are similar to the, the previous injunction.  It

17  prohibits Mr. Cardozo from contacting Jane Doe No. 3 in any, in

18  any means or method.  He's prohibited from harassing her,

19  stalking her, communicating with her, uh-huh.

20  Q   And I want to direct your attention to Page 3, Paragraph 3

21  of Exhibit No. 8.

22  A   Uh-huh (indicating an affirmative response).

23  Q   What is that prohibition?

24  A   (Reading):

25      "Respondent shall not use or possess a firearm or

1   ammunition."

2   Q    Okay.

3        And what was Mr. Cardozo's response, if any, to this

4   permanent injunction?

5   A    He continued to contact her, call her, text her.

6   Q    And you -- what were the nature of any of those

7   communications?

8   A    They were threatening in nature.  He --

9   Q    Do you remember anything specific?

10  A    He threatened to come to the restaurant and slit her

11  throat.

12  Q    And what, if anything -- what of consequence, if anything,

13  happened?

14  A    There, there was an injunct -- there was a finding of a

15  violation of the injunction.

16  Q    Okay.  I'd like to direct your attention to Paragraph,

17  Exhibit No. 9, which is a police report from November 9, 2016.

18       Is it fair to say that this describes some communications

19  between Mr. Cardozo and Jane Doe 3?

20  A    It does.

21  Q    And I'd like to direct your attention to Exhibit No. 10,

22  which is the February 24, 2017 *nolo contendere* judgment --

23  A    Uh-huh (indicating an affirmative response).

24  Q    -- against Mr. Cardozo.

25       So this is February 2017.  And remind me when was the

 1  injunction entered?

 2  A    That was November of 2016.

 3  Q    So a few months earlier?

 4  A    Uh-huh (indicating an affirmative response).

 5  Q    Okay.

 6       Did Jane Doe No. 3 describe any impact this had on her

 7  life?

 8  A    Yes.  She ended up leaving the employment.  She -- it

 9  scared her to be there.

10  Q    During the course of your investigation were you able to

11  review any information about Mr. Cardozo's criminal history?

12  A    I was.

13  Q    What did you review?

14  A    I reviewed police incident reports as well as his criminal

15  history.

16  Q    Big picture, tell us about his criminal history.

17  A    He's got multiple convictions to include violent offenses,

18  drug offenses.  He's got the protection orders we've discussed,

19  violations of court orders.  The -- he's got three felony

20  convictions, I believe.  Two for assault, one for larceny.

21  Q    Has he ever been in custody?

22  A    He has.

23  Q    More than once?

24  A    Yes.

25  Q    And does he have any -- did you mention probation

1   violations?  I don't remember.  I'm not trying to put words in

2   your mouth.

3   A    Yeah.  I don't recall reading a probation violation.

4   Q    Okay.

5        And have you had an opportunity to review any police

6   reports other than Exhibit No. 10 that I just showed you?

7   A    I have.

8   Q    I want to direct your attention to June 2016 and Exhibit

9   No. 11, please.

10       So this is a June 5, 2016 police report from the

11  Jacksonville Sheriff's Office regarding a battery on a licensed

12  security officer.  Have you had an opportunity to read this

13  police report?

14  A    I have.

15  Q    And tell us about it.  What happened?

16  A    Essentially, a police officer was working at the hospital

17  in an off-duty capacity and he was called for assistance to one

18  of the hospital rooms.  When he arrived he observed Security

19  and hospital staff attempting to restrain Mr. Cardozo.

20  Mr. Cardozo was fighting, threatening the staff, attempting to

21  bite the people who were trying to hold him down.  He was

22  aggravated.  He was threatening.  He recognized the officer

23  when he arrived and directed some negative law enforcement

24  comments towards him.

25  Q    Like what did he say, if you remember?

1   A    "There's a special place in hell for cops.  I'm going to

2   sue you.  I should spit on you."

3   Q    Okay.

4        And I want to direct your attention to the last paragraph

5   of the second page of Exhibit 11.

6   A    Uh-huh (indicating an affirmative response).

7   Q    Could you please read that where it starts, "A local

8   records check"?

9   A    (Reading):

10       "A local records check of the suspect only revealed his

11  Baker Act on 6/1/16, CCR 354983, where he resisted officers'

12  attempts to take him into custody after abusing synthetic

13  drugs.  The suspect is a convicted felon for grand theft and

14  battery, two times.  The suspect has numerous arrests in South

15  Florida.  A complete criminal history was not available at the

16  time of this report."

17  Q    And, Special Agent Fahey, do you, have you had an

18  opportunity to familiarize yourself with the term "Baker Act"?

19  A    I have.

20  Q    What does that mean?

21  A    From my understanding, a Baker Act in Florida is a

22  involuntary committal of a subject who poses a risk to himself

23  or others and is unable to seek services through their own,

24  through their own decision.

25  Q    And are you aware whether during the course of the FBI's

1  investigation of Mr. Cardozo they were conducting surveillance

2  of him leading up to the day of his arrest?

3  A    They were.

4  Q    And could you tell us what, if anything, they observed him

5  doing while they were surveilling him?

6  A    On one occasion they observed him, him and his father,

7  attend a firing range, a firearms range in Florida.

8  Q    And I'd like to direct your attention to Exhibit No. 12.

9  A    Uh-huh (indicating an affirmative response).

10  Q    Is this a photograph showing Mr. Cardozo and his dad at the

11  firing range?

12  A    It is.

13  Q    And what is Mr. Cardozo holding in his hand?

14  A    A firearm, a handgun.

15  Q    One moment.

16  A    Uh-huh (indicating an affirmative response).

17      (Pause)

18          MS. SEDKY:  I have nothing further, your Honor.

19          THE COURT:  Cross-examination?

20                      CROSS-EXAMINATION

21  BY MS. PEACHY:

22  Q    Good morning, or afternoon, Agent Fahey.

23  A    Good morning -- good afternoon.

24  Q    So you were just talking about the 2016 incident where

25  Mr. Cardozo assaulted a police officer in the hospital,

1   correct?

2   A    Correct.

3   Q    And he was -- you described the Baker Act, correct?

4   A    I did.

5   Q    And at the time of that assault on a police officer that's

6   when Mr. Cardozo was, in fact, involuntarily committed,

7   correct?

8   A    I'm not certain if that was the reason for his -- his

9   commission -- his --

10  Q    He's in the hospital --

11  A    Yep.

12  Q    -- correct?

13  A    Yep.

14  Q    The date of the incident is 6/5/16 --

15  A    Correct.

16  Q    -- correct?

17       That paragraph that you read at the bottom of the report

18  said that he was Baker Acted on 6/1/16, correct?

19  A    Correct.

20  Q    Okay.  Do you have any information about what his mental

21  health diagnoses was at the time?

22  A    I do not.

23  Q    Do you have any information about what kind of medications

24  he was receiving at the time?

25  A    I do not.

1   Q    Do you have any information if he was under the influence

2   of any illegal drugs at the time?

3   A    I do not.

4           THE COURT:   Ms. Peachy, are you saying that the, he

5   was in this hospital subject to this commitment?

6           MS. PEACHY:   Yes.

7           THE COURT:   Okay.

8   BY MS. PEACHY:

9   Q    You also mentioned a, these communications with the woman

10  referred to as Jane Doe 3 in 2016.

11  A    Uh-huh (indicating an affirmative response).

12  Q    You testified on direct examination that she said that

13  Mr. Cardozo threatened to come to the restaurant and slit her

14  throat?

15  A    Correct.

16  Q    When did Jane Doe No. 3 tell you that?

17  A    That was during the -- she was interviewed within the last

18  week.

19  Q    So she told that to an agent this, sometime during this

20  past week?

21  A    Yes.

22  Q    You've reviewed the documents in Government Exhibits, I

23  guess it's, say, 7, 8, and 9, correct, pertaining to Jane Doe

24  No. 3?

25  A    I have.

1  Q   And 10, I guess.  Those are the, those are the exhibits

2  that pertain to Mr. Cardozo's interactions with Jane Doe No. 3,

3  correct?

4  A   Correct.

5  Q   Exhibit 7 and 8 are the petitions for -- well, Exhibit 7 is

6  a petition for an injunction against Mr. Cardozo, correct?

7  A   Correct.

8  Q   In which she and/or her mother, I guess, who's moving for

9  the injunction on her behalf, described the basis for the

10  request, correct?

11  A   Uh-huh, correct.

12  Q   And nowhere in there is, is there any mention of

13  Mr. Cardozo threatening to slit her throat, is there?

14  A   There was not.

15  Q   And in Exhibit No. 9, the police report regarding contact

16  that Mr. Cardozo had with Jane Doe No. 3 after she applied for

17  the injunction, she doesn't tell the police in that police

18  report that Mr. Cardozo ever threatened to slit her throat,

19  does she?

20  A   She does not.

21  Q   So nowhere in the documents created at the time does Jane

22  Doe No. 3 mention Mr. Cardozo threatening to slit her throat?

23  A   She did not.

24  Q   It was only until a week ago that she said that?

25  A   Correct.

1   Q    I also want to ask you some questions about Jane Doe No. 2,

2   who's described as Beth, I believe you said, in Jane Doe No.

3   1's essay, correct?

4   A    Correct.

5   Q    She was Jane Doe 1's friend in high, in middle school and

6   high school, correct?

7   A    Correct.

8   Q    In that essay that Jane Doe 1 published online about her

9   experiences when she was 13 years old she talks about recent

10  communications she has with Beth, or Jane Doe No. 2 --

11  A    Uh-huh (indicating an affirmative response).

12  Q    -- correct?

13  A    Correct.

14  Q    So in preparation for writing this essay Jane Doe No. 1

15  reaches out to Jane Doe No. 2, correct?

16  A    Correct.

17  Q    They talk about Chad, or Mr. Cardozo, correct?

18  A    Correct.

19  Q    And in the essay published by Jane Doe No. 1 where she's

20  describing getting back in touch with Jane Doe No. 2 she

21  describes how she asked Jane Doe No. 2 specifically, "Do you

22  feel that he assaulted you," correct?  Remember that part of

23  the essay?

24  A    I don't recall that specific part.

25  Q    Okay.

1       (Pause)

2               MS. PEACHY:  May I approach?

3               THE COURT:  Yes.

4               MS. PEACHY:  Okay.

5   BY MS. PEACHY:

6   Q    Agent Fahey, I'm showing you a document, first of all.

7   (Counsel shows document to the witness.)

8   A    Uh-huh (indicating an affirmative response).

9   Q    Do you recognize what that is?

10  A    I do.

11  Q    That's the essay published by Jane Doe No. 1 --

12  A    It is.

13  Q    -- correct?

14  A    Yep.

15  Q    Okay.  That we're talking about.

16       And directing your attention to Page 13 down here at the

17  bottom.

18  A    Yep.

19  Q    That's the part where Jane Doe No. 1 is describing getting

20  back in touch with Jane Doe No. 2 to talk about Mr. Cardozo --

21  A    Yep.

22  Q    -- correct?

23  A    Yep.

24  Q    And on the next page the last two lines of the

25  correspondence described there says, "Do you feel that he

1    assaulted you," correct?

2    A    Correct.

3    Q    And then the response is, "No," she says.  "I think he only

4    ever wanted love," correct?

5    A    Correct, correct.

6    Q    That's the response from Jane Doe No. 2?

7    A    Yep.

8    Q    Okay.

9         And did Mr. -- during the time period that Mr. Cardozo was

10   communicating with Jane Doe online, the communications in

11   Government Exhibit 6 that you read from, did Mr. Cardozo ever

12   try to get in touch with her in person?

13   A    No.

14   Q    Did --

15   A    Not that I'm aware of.

16   Q    Okay.  He didn't try to seek her out in person in any way,

17   correct?

18   A    No.  Correct.

19   Q    And their, their communications were limited to the

20   Internet, correct?

21   A    Correct.

22   Q    As part of the FBI's investigation did you look up whether

23   Mr. Cardozo has purchased any firearms?

24   A    I'm not aware of that, if that check has been conducted.

25   Q    Or if he's a registered owner of any firearms?

1  A    I'm not aware of that.

2  Q    Are you aware that the FBI searched the apartment

3  Mr. Cardozo was staying in when he was arrested?

4  A    I am.

5  Q    Okay.  They had a search warrant, correct?

6  A    Uh-huh (indicating an affirmative response).

7  Q    Did they find any firearms in his apartment?

8  A    No.

9  Q    Did they find any weapons of any kind in his apartment?

10  A    Not that I'm aware of.

11  Q    And you said you've reviewed Mr. Cardozo's criminal

12  history, correct?

13  A    I have.

14  Q    And there's nothing on his record relating to the use of

15  firearms, correct?

16  A    No, not that I can recall.

17  Q    Or weapons?

18  A    Nope.

19  Q    Moving on to Jane Doe No. 1 now, you mentioned that she

20  hired a private attorney?

21  A    Yes.

22  Q    And you've reviewed the indictment in this case, correct?

23  A    I have.

24  Q    Is that the representative of Jane Doe 1 referenced in the

25  indictment?

1   A    I would have -- I'm not sure of the context of that.

2   Q    Okay.  I'm look -- do you have the indictment?

3   A    No.

4   Q    No?  Okay.

5        Okay.  I'm looking at Paragraphs 15 and 21.  (Counsel shows

6   document to the witness.)

7        I'm looking at Paragraphs 15 and 21 of the indictment.

8   A    Okay.

9   Q    So in those paragraphs it says that "a representative of

10  Jane Doe 1 notified legal authorities about communications she

11  was receiving from Cardozo," correct?

12  A    Correct.

13  Q    In both those paragraphs is the representative mentioned

14  there Jane Doe's attorney that she hired?

15  A    Yes, I believe it is.

16  Q    And who are the "legal authorities" that the attorney

17  notified on those occasions?

18  A    I believe it was his probation officer or --

19  Q    Okay.  Not the police?

20  A    No, I don't believe so.

21  Q    So neither Jane Doe nor the, her hired attorney contacted

22  the police in those months?

23  A    Not that I can recall.

24  Q    At what point were the police contacted about this?

25  A    I know there was the, the injunction was sought, but --

1   Q    Were the police involved in the injunction?

2   A    No.  I, I don't recall.

3   Q    Okay.  Who originally contacted the FBI?

4   A    I don't recall.

5   Q    Okay.

6        So Jane Doe's attorney contacts Mr. Cardozo's probation

7   officer for the purpose of, what, telling the probation officer

8   that that person, they think that he's in violation of his

9   probation?

10  A    I believe so, yes.

11  Q    And Jane Doe No. 1 actually filed an affidavit that the --

12  to the pro -- sent an affidavit to the probation officer,

13  correct?

14  A    I haven't read that.

15  Q    Did the probation office -- did Mr. Cardozo's probation

16  officer bring forth a violation based --

17  A    Yes.

18  Q    -- on his communications with Ms., with Jane Doe No. 1?

19  A    Yes.

20  Q    And that was heard before a judge in Florida, correct?

21  A    Yes.

22  Q    And the judge discharged the violation, correct?

23  A    Correct.

24  Q    And terminated Mr. Cardozo's probation, correct?

25  A    I, I'm not sure if the termination of the probation was at

1   the same time as the discharging.

2   Q    Basically, the judge -- I mean, we use different

3   terminology here -- but basically, the judge dismissed the

4   violation --

5   A    Yes.

6   Q    -- correct?

7   A    Yes.

8   Q    Okay.

9        At some point the FBI did speak to Jane Doe No. 1, correct?

10  A    Correct.

11  Q    Was her attorney with her?

12  A    I'm not aware.

13  Q    Okay.

14       You mentioned the -- we, we were talking about the

15  restraining order that Jane Doe No. 1 obtained against

16  Mr. Cardozo, or injunction as they call it in Florida, and

17  that's contained in, in Government Exhibit 4.

18       Does that indicate whether Mr. Cardozo came to court for

19  the hearing on that injunction?

20  A    It --

21  Q    On the, on the first page?

22  A    Correct.  It, it indicates he was not present.

23  Q    Okay.

24       And going to the last page of that order is there any

25  acknowledgment by Mr. Cardozo of receiving that restraining

1   order at that time?

2   A    There is not.

3   Q    Okay.  So he didn't go to court in Florida when, when Jane

4   Doe No. 1 went to court in Florida to seek the restraining

5   order, correct?

6   A    Correct.

7   Q    Even though he would have received notice of the hearing,

8   correct?

9   A    Yes.

10  Q    Okay.  You mentioned that in the time period between 2001,

11  I think it was, and 2015 that Mr. Cardozo reached out

12  periodically over Facebook to Jane Doe No. 1?

13  A    He did, yep.

14  Q    So Jane Doe No. 1 tells you that Mr. Cardozo initiated

15  contact between them?

16  A    He did.

17  Q    Do you have -- has the FBI obtained those Facebook messages

18  going back to, prior to 2015?

19  A    I'm not certain if the FBI has copies of those.

20  Q    Okay.

21      Now Jane Doe No. 1, you said, decided to correspond with

22  Mr. Cardozo for purposes of writing this essay, correct?

23  A    Correct.

24  Q    And again, in her essay that she publishes online she

25  describes the correspondence that she has with Mr. Cardozo just

1   prior to writing the essay, correct?

2   A    Correct.

3   Q    She describes things that Mr. Cardozo told her about

4   himself in those correspond, in that correspondence, correct?

5   A    Correct.

6   Q    Like how he's struggled with drug problems, correct?

7   A    Correct.

8   Q    How he's been arrested and, and in jail, correct?

9   A    Correct.

10  Q    And he -- in those -- in that correspondence before the

11  essay was published Mr. Cardozo was not threatening in any way,

12  correct?

13  A    Correct.

14  Q    He was not harassing her in any way, correct?

15  A    Correct.

16  Q    And, as you said, he gave her permission to write the

17  story, correct?

18  A    He did.

19  Q    Before she published the story online did she show it to

20  Mr. Cardozo?

21  A    I'm not aware.

22  Q    Okay.  She published it on a public website, correct?

23  A    She did.

24  Q    In which -- and in the essay she doesn't call him a rapist,

25  but she basically describes him that way, fair to say?

1   A    She, she describes the sexual encounter from her --

2   Q    As nonconsensual --

3   A    -- perspective.

4   Q    -- and forceful, forced, you said?

5             MS. SEDKY:  Objection.

6             THE COURT:  I'm sure it says something.  I don't have

7   it, but --

8   BY MS. PEACHY:

9   Q    Well, in direct you said she describes the sexual encounter

10  as forced --

11  A    She did.

12  Q    -- correct?

13  A    Correct.

14  Q    Nonconsensual, fair to say?

15  A    Fair to say.

16  Q    Okay.

17  A    Yep.

18  Q    Are you aware that on other websites Jane Doe No. 1 has

19  expressed doubts about whether or not her memory of the

20  incident was accurate?

21  A    I'm not aware of that.

22  Q    Are you aware that on some other websites she's said that

23  some of her own family members doubt that it happened the way

24  she described?

25  A    I'm not aware of that.

1  Q   You're aware that Mr. Cardozo wrote his own version, his,

2  of what happened back in 2001, correct?

3  A   I've seen messages that he's posted --

4  Q   Okay.

5  A   -- detailing his, but I haven't seen an openly authored

6  account.

7  Q   So the messages that you've seen are Facebook messages?

8  A   They're the comments that were posted to the article.

9  Q   Okay.  So in the Comments section of the article

10  Mr. Cardozo wrote his recollection of what happened between him

11  and Jane Doe No. 1 in the car in 2001, correct?

12  A   Correct.

13  Q   The way he remembers it is different than the way she

14  remembers it, fair to say?

15  A   Fair to say.

16  Q   Now Mr. Cardozo, as far as you're aware, since, since they,

17  him and Jane Doe were in the same high school-middle school,

18  has not had physical contact with Jane Doe, correct?

19  A   Correct.

20  Q   He has not tried to find out where she lives?

21  A   Correct.

22  Q   As far as you're aware, correct?

23  A   Correct.

24  Q   Has he ever asked her where she lives?

25  A   Not that I'm aware of.

1   Q   He's never tried to have physical contact with her, as far

2   as you're aware, correct?

3   A   Correct.

4   Q   As far as you're aware, he never left the State of Florida

5   during this time period when he's sending these messages,

6   correct?

7   A   Correct.

8   Q   Again, his, his contact with Jane Doe No. 1 was all online,

9   correct?

10  A   Correct.

11  Q   They never even spoke on the phone, correct?

12  A   Correct.

13  Q   And he never tried to have anyone have physical contact

14  with her on his behalf, correct?

15  A   Correct.

16  Q   Never sent anyone out to try to find her or have contact

17  with her, correct?

18  A   Correct.

19  Q   But, but she did, correct?

20  A   I don't know if she intended to have someone physically

21  contact him on her behalf.

22  Q   You said she, she hired a private investigator, correct?

23  A   Correct.

24  Q   Called Apache Investigations, correct?

25  A   I'm not sure of the, the company name.

```
 1          MS. SEDKY:  Objection.  She's misstating the witness'

 2   testimony.

 3          MS. PEACHY:  I was asking a question.

 4          THE COURT:  I think it -- I -- my memory is that a

 5   family member hired an investigation firm to survey --

 6          MS. PEACHY:  Right.

 7          THE COURT:  -- to surveil him.

 8          MS. PEACHY:  I was just asking the question if he knew

 9   the name.

10          THE WITNESS:  Uh-huh (indicating an affirmative

11   response).

12   BY MS. PEACHY:

13   Q   So you don't know the name of the private investigation

14   firm?

15   A   I don't.

16   Q   These private investigators followed Mr. Cardozo, correct?

17   A   I believe so.

18   Q   They spoke -- the private investigators also spoke to

19   Mr. Cardozo's probation officer?

20   A   I'm not aware of that.

21   Q   The private investigators detained an Uber driver who had

22   just dropped Mr. Cardozo off, correct?

23   A   Correct.

24   Q   As a result of that incident Mr., the private investigator

25   was actually charged criminally, correct?
```

1   A   I know there was an investigation into that incident.  I'm

2   not, I wasn't aware of the results.

3   Q   Okay.  Have you reviewed the police report pertaining to

4   that incident?

5   A   I have not.

6   Q   Okay.

7       Did you ask Jane Doe No. 1 about that incident?

8   A   Of the Uber driver incident?

9   Q   Yes.

10  A   I'm not aware that she was asked that question.

11  Q   Okay.  But she was asked about another incident with the

12  private investigator where the private investigator or

13  investigators beat up Mr. Cardozo, correct?

14          MS. SEDKY:  Objection.

15          THE COURT:  Overruled.

16  BY MS. PEACHY:

17  Q   Right?

18  A   Yes.

19  Q   She was asked about that, right?

20  A   Yep.

21  Q   How did the FBI find out about that?

22  A   I'm, I'm not aware of who initially --

23  Q   Did Jane Doe --

24  A   -- reported it?

25  Q   -- No. 1 tell the FBI about it or did the FBI find about,

1    out about it some other way?

2    A    I'm not sure.

3    Q    That incident where the private investigators beat up

4    Mr. Cardozo was described in direct examination as a

5    "confrontation" between Mr. Cardozo and the private

6    investigators, you recall that?

7    A    I do.

8    Q    The private investigators went to Mr. Cardozo's home,

9    correct?

10   A    I believe that's where the, it occurred, yeah.

11   Q    The assault happened at his home --

12   A    Uh-huh (indicating an affirmative response).

13   Q    -- correct?

14   A    Uh-huh (indicating an affirmative response).

15   Q    Are you aware of anything that Mr. Cardozo did to instigate

16   the private investigators?

17   A    No.

18   Q    Are you aware of the extent of Mr. Cardozo's injuries from

19   that assault?

20   A    Other than the, the message that I read referring to $8,000

21   worth of medical bills.

22   Q    Are you aware of a state prosecution pertaining to that

23   assault on Mr. Cardozo?

24   A    I'm aware of an investigation.  I'm not aware of a

25   prosecution.

1    Q    Have the FBI agents spoken to the Florida detective who's

2    in charge of those investigations?

3    A    They have.

4    Q    Okay.  Have they spoken to the prosecutor who's in charge

5    of prosecuting those offenses?

6    A    I'm, I'm not aware of that.

7    Q    Okay.

8         You mentioned that the FBI did some surveillance of

9    Mr. Cardozo and that's how they were able to take that picture

10   of Mr. Cardozo in the shooting range, correct?

11   A    Correct.

12   Q    Apache was also doing surveillance on Mr. Cardozo, correct?

13   A    Yes.

14   Q    Did the FBI surveillance of Mr. Cardozo overlap with

15   Apache's investigation of Mr. Cardozo?

16   A    I'm unaware.

17   Q    Did Jane Doe continue to retain Apache Invest, the, these

18   private investigators after they beat up Mr. Cardozo?

19   A    I'm unaware.

20   Q    Have you seen any contract or correspondence between Jane

21   Doe No. 1 and these private investigators that sets forth the

22   extent of her agreement with the private investigators?

23   A    I have not.

24   Q    But she told the FBI agents that she did not ask them to

25   beat up Mr. Cardozo, correct?

1    A    Correct.

2    Q    Do you have any indication about why the private

3    investigators would have beaten up Mr. Cardozo?

4    A    I don't.

5    Q    Did she tell you how much she hired these private

6    investigators for?

7    A    No, I don't believe so.

8    Q    Do you -- are you aware if, if Jane Doe No. 1 has been

9    interviewed by the Jacksonville Police who are investigating

10   these incidents?

11   A    I'm not aware.

12   Q    Or if she's cooperating with them in that case --

13   A    I'm unaware.

14   Q    -- those cases?

15        If Mr. Cardozo is released in this case, will Jane Doe

16   continue to retain these private investigators?

17   A    I don't know.

18            MS. PEACHY:  I have nothing further.

19            MS. SEDKY:  Just a few follow-up questions, your

20   Honor, if I may.

21            THE COURT:  Okay.

22                         REDIRECT EXAMINATION

23   BY MS. SEDKY:

24   Q    Special Agent Fahey, in terms of the timeline when Ms. Jane

25   Doe 3 was being interviewed by the FBI, was that within the

1  last, say, two weeks?

2  A    It was.

3  Q    And did Ms., did Jane Doe 3 give you any indication of when

4  Mr. Cardozo threatened to slit her throat in the timeline?

5  A    I believe she said that it was in response to the

6  injunction.

7  Q    And by "injunction," do you mean the permanent injunction

8  or the earlier preliminary injunction?

9  A    I'm uncertain.

10  Q    Okay.  So I just want to refresh your recollection about

11  the date of the, the petition for Exhibit 7 is dated November

12  4th and the final injunction goes in November 15th, is that

13  correct?

14  A    Correct.

15  Q    Now the police report, which is Exhibit 9, is November 9th,

16  is that correct?

17  A    Correct.

18  Q    So that's before the final injunction?

19  A    It is.

20  Q    So if, if, hypothetically, the threats came in after the

21  final injunction, they would not have been in this police

22  report, is that fair to say?

23  A    Correct.

24  Q    And is it also fair to say that the FBI at this juncture

25  has not been able to obtain every single police report

1    involving Mr. Cardozo?

2    A    That's correct.

3    Q    And is it also fair to say that, in all candor, the FBI

4    does not know exactly how it was that Mr. Cardozo violated that

5    final injunction?  Is that fair to say?

6    A    That's correct.

7    Q    All we -- all the FBI knows is that he, in fact, pled *nolo*

8    *contendere* several months later to violating it?

9    A    Correct.

10   Q    Are you aware of a -- do you know what a Certificate of

11   Service is, a proof of service?

12   A    Yes.

13   Q    And are you aware whether in the course of the FBI's

14   investigation they have obtained from the victims a Certificate

15   of Service proving that Mr. Cardozo was, in fact, served with

16   the final injunctions?

17   A    I'm unaware.  I haven't seen one.

18   Q    And, Special Agent Fahey, Ms. Peachy was asking you about

19   the attempts by Jane Doe 1's attorneys to petition for, for

20   Mr.  Cardozo's community confinement to be withdrawn.  Do you

21   recall that line of questioning?

22            THE COURT:  Can I have that again?

23            THE WITNESS:  No.

24            THE COURT:  I, I didn't understand the question.

25            MS. SEDKY:  I thought there was a -- okay.  I withdraw

1   the question, then.

2            I have nothing further.

3            MS. PEACHY:  Nothing further.

4            THE COURT:  Anything further?

5            MS. PEACHY:  No.

6            THE COURT:  You may step down.

7            THE WITNESS:  Thank you.

8            THE COURT:  Does the Government have any further

9   evidence?

10           MS. SEDKY:  No further evidence from the Government,

11  your Honor.

12           THE COURT:  Okay.

13           Does the defendant have any evidence?

14           MS. PEACHY:  Yes, your Honor.  We're going to call my

15  investigator, Kevin Rickel.

16           THE COURTROOM DEPUTY:  Please raise your right, please

17  raise your right hand.

18                KEVIN RICKEL, DEFENSE WITNESS, SWORN

19           THE COURTROOM DEPUTY:  Please be seated.  Please state

20  your full name, spelling your last name for the record.

21           THE WITNESS:  It's Kevin Rickel.  It's R-I-C-K-E-L.

22                         DIRECT EXAMINATION

23  BY MS. PEACHY:

24  Q    Okay, Mr. Rickel.  How are you employed?

25  A    I'm employed as an investigator at the Federal Public

1   Defender Office.

2   Q   Okay.  Fair to say we work in the same office --

3   A   Yes.

4   Q   -- correct?

5   A   Yes, we do.

6   Q   Did I ask you to assist me in Byron Cardozo's case

7   recently?

8   A   Yes, you did.

9   Q   Okay.  As part of your job in assisting in Mr. Cardozo's

10  case did you speak to a detective in Jacksonville, Florida?

11  A   Yes, I did.

12  Q   What was the name of that detective?

13  A   Bill Fitzgerald.

14  Q   Okay.  And why did you contact that detective?

15  A   I contacted him to, to try to obtain some copies of

16  incident reports from his department related to some recent

17  arrests of a private investigator by the name of David

18  Gonzalez.

19  Q   Okay.  And what did the detective tell you about obtaining

20  those police reports?

21  A   He said that he felt more comfortable for our office to

22  contact the state attorney that was handling the cases before

23  releasing any reports.

24      So he just gave me the case numbers of two arrests of David

25  Gonzalez and asked me to, asked our office to contact the state

1  attorney.

2  Q    Okay.  And were you able to obtain police reports for these

3  two incidents?

4  A    For the -- through the state attorney?

5  Q    Eventually, were you able to obtain both police reports?

6  Not through the --

7  A    I think there was a --

8  Q    -- state attorney, in any way?

9  A    Right.  I believe there -- well, I believe only one of the

10 police reports are --

11 Q    Were you able -- so you were able to obtain one police

12 report through the state's attorney's office?

13 A    Not through the state's attorney's office.

14 Q    Okay.  Were you able to -- were, were any police reports

15 obtained through the state's attorney's office?

16 A    No.

17 Q    Okay.  How did you obtain the police reports?

18 A    There was a police report that was available publicly

19 online through the Duval Circuit Court website.

20 Q    Okay.  I'm going to show you Exhibit 1, which is --

21 (Counsel shows exhibit to the witness.)

22 A    Sorry.

23 Q    Do you recognize that?

24 A    Yes.  Yes, I do.

25 Q    And what is it?

1  A   It's the police report that was obtained off of the Duval

2  County court website pertaining to an arrest of David Gonzalez.

3  Q   And just briefly, what does the, what does the, those court

4  documents describe?

5  A   It's a report related to David Gonzalez stopping an Uber

6  driver to question him related to Byron Cardozo.

7  Q   And does it say how Mr. Gonzalez was employed at the time?

8  A   Does it say in this report?

9  Q   Did you learn at some point, whether or not it'd be from

10 those papers, how Mr. David Gonzalez was employed at the time?

11 A   Yes, I did.

12 Q   And how is he employed?

13 A   He's employed as a private investigator with a firm by the

14 name of Apache Investigations.

15 Q   Okay.  And relating to that same incident described in, in

16 the Defense Exhibit 1 are you aware of whether or not charges

17 have been filed against Mr. Gonzalez in relation to that

18 incident?

19 A   Yes, they have.  I've been told they have.

20 Q   Okay.  And those charges remain pending, correct?

21 A   As far as I'm aware, yes.

22 Q   Okay.  Are you aware of what the charges are that were

23 brought against Mr. Cardozo?

24 A   I was told by Detective Fitzgerald that it was

25 impersonating a police officer, but I don't know if that's the

1   specific charge that's --

2   Q   I'm sorry.

3   A   -- stated on the paper.

4   Q   Mr. Gonzalez.  I'm sorry.

5   A   I'm sorry.

6   Q   I said Cardozo by mistake.

7   A   Oh, sorry.

8   Q   Okay.

9       Were you able to obtain a police -- were -- were you -- did

10  you also obtain some documents from Mr. Cardozo's father?

11  A   Yes.  He sent some documents to our office, yes.

12  Q   Okay.  I'm showing you Exhibit No. 2.  (Counsel shows

13  exhibit to the witness.)

14  A   Yes.

15  Q   Do you recognize that?

16  A   Yes, I do.

17  Q   And is that a -- fair to say that's a Jacksonville police

18  report, correct?

19  A   Jacksonville Sheriff's Office.

20  Q   And what does that police report describe, generally?

21  A   It's describing an assault that occurred on Mr. Cardozo,

22  Byron Cardozo.

23  Q   Okay.  And does it -- when you spoke to Detective

24  Fitzgerald about this incident did he tell you who the, who

25  they suspect was responsible for that assault?

1   A    Yes.  He said both incidents, they suspected David

2   Gonzalez.

3   Q    The -- the person --

4   A    The private investigator.

5   Q    -- the private investigator, correct?

6        Does that police report match the incident number that

7   Detective Fitzgerald gave you, if you can recall?

8   A    Yes, it does.

9   Q    Okay.  Are you aware of whether charges have been filed

10  against Mr. Gonzalez for the beating on Mr. Cardozo described

11  there?

12  A    My understanding from Detective Fitzgerald is that charges

13  have not yet been filed as of the time that I had spoken to

14  him.

15  Q    Did he explain why?

16  A    He said that they were eager to pursue the case, but

17  they -- because of -- I believe he said because of a Speedy

18  Trial Act in Florida they were concerned that Mr. Cardozo would

19  not be available as a witness.  So they were still deciding

20  what to do with the case as of the time I spoke with him.

21  Q    Okay.

22       Did Mr. Cardozo's father send any additional documents?

23  A    Yes, he did.

24  Q    Okay.

25       I'm showing you Exhibit 3 and 4.  (Counsel shows exhibits

1   to the witness.)

2   A    Yes.

3   Q    Exhibit 3 contains medical bills, correct?

4   A    Yes, it does.

5   Q    For Byron Cardozo, correct?

6   A    Correct.

7   Q    And the date of service on those bills, many of them

8   correspond to the date of the assault in Exhibit 2, correct?

9   A    Yes.

10  Q    And other bills correspond to the date of surgery described

11  in Exhibit 4, correct?

12  A    Yes.

13  Q    Okay.  And the surgery is for a fractured orbital bone,

14  correct?

15  A    Yes.

16  Q    And it describes that, in that brief report, it describes

17  that that was the result of an assault?

18  A    Let's see.

19  Q    An altercation?

20  A    Correct, yes.

21  Q    Okay.  Did Mr. Cardozo's mother send you anything relating

22  to her son?

23  A    She sent some photographs to our office, yes.

24  Q    Okay.

25       I'm showing you Exhibit 5.  (Counsel shows exhibit to the

1    witness.)

2    A    Just those two, yeah.  Yes.

3    Q    Those are some of the photographs that Deborah Cardozo,

4    Mr. Cardozo's mother, sent, sent to our office, correct?

5    A    Yes, she did.

6    Q    And she explained that those photographs are photographs of

7    Mr. Cardozo in the hospital after he was assaulted, correct?

8    A    That's what she said, yes.

9    Q    Okay.

10              MS. PEACHY:  I don't have anything further, your

11   Honor.

12              MS. SEDKY:  Nothing from the Government, your Honor.

13              THE COURT:  You may step down.

14              THE WITNESS:  Thank you.

15              THE COURT:  Any further evidence?

16              MS. SEDKY:  Nothing from the Government, your Honor.

17              THE COURT:  All right.

18              MS. PEACHY:  Nothing further, your Honor.

19              THE COURT:  You want to be heard?

20              MS. PEACHY:  Oh, yeah.  I had one other exhibit that I

21   submitted to the Court, your Honor.  It's a letter regarding

22   employ --

23              THE COURT:  I see.

24              MS. PEACHY:  -- employment opportunity for Mr. Cardozo

25   should he be released.

1          THE COURT:  I'm assuming that's his father?

2          MS. PEACHY:  Yes.

3          THE COURT:  Is that right?

4          MS. PEACHY:  It's with his father, yes.

5          THE COURT:  Right.  Okay.

6          I'll hear from the Government.

7          MS. SEDKY:  Thank you, your Honor.  Yes.

8          Your Honor, the Government is moving for Mr. Cardozo

9    to be detained under two bases; first, that he's a risk of

10   flight under 3142(f)(2)(A).  Mr. Cardozo has been transient.

11   He has not had any full-time employment that extended more

12   than, from what the Government could tell, a year.  He worked

13   for approximately a year in 2015 according to the Pretrial

14   Services report at a place called Tijuana Flats -- it's unclear

15   what that is -- and a year at Five Guys in 2016.  As the Court

16   has heard, that was employment that was terminated included a,

17   an assault on a, on a teenage girl.  He has, now has an offer

18   of employment from his father with a claim that he will be some

19   type of manager, but it is unclear what type of actual work

20   duties Mr. Cardozo would be able to conduct.

21          Thus, he has no consistent source of income and he has

22   no stable home.  He's been living with his mother and then his

23   father in his mid-30s.  He's also been in and out of jail, as

24   the Court has heard.

25          He's also a flight risk because of the nature of the

1   offense.   It's an offense that inherently involves deceit.

2   Your Honor heard about the use of aliases, heard about the use

3   of anonymizing devices, including techniques to keep himself

4   anonymous online, VPNs to allow him to contact the victims in

5   this case without detection, and just one mistake where he used

6   his mother's IP address and failed to obscure it through a VPN.

7   And your Honor saw the example of that.   That is indicative of

8   many of the kinds of investigations we have in cybercrime cases

9   where there is significant obfuscation of identity,

10  anonymization, and then, fortunately, often one mistake, but it

11  makes these cases very hard to investigate and is an example of

12  why Mr. Cardozo remains a flight risk.

13          There's also significant -- the weight of the evidence

14  in this case weighs in favor of detention and is a reason why

15  he's a flight risk.   Your Honor had heard about both the

16  circumstantial around the, the time and the comments of the

17  things that Mr. Cardozo was saying when he was anonymous and

18  then the forensic evidence that tied the cyberstalking and the

19  interstate threats directly to Mr. Cardozo.   Given his criminal

20  history category and the combination of the sentencing

21  guidelines, Mr. Cardozo's likely facing a term of years of

22  incarceration and that contributes to the, the flight risk.

23          Second, your Honor, there is a risk, a significant

24  risk in this case of obstruction of justice by threatening and

25  intimidating witnesses under 3142(f)(2)(B).   That's another

1    reason why Mr. Cardozo should be detained.   The very nature of

2    this offense involves significant threats to witnesses.   And

3    I'll read to your Honor from Paragraph 31 of the indictment,

4    which is the threat that's also charged in the charging

5    document.   Mr. Cardozo posted a comment on the victim's website

6    saying:

7              "You fucking bitch.   Keep it up and you will know what

8              it means to be assaulted.   You are fucking done.   I

9              dare you to keep pulling this shit.   I fucking dare

10             you, bitch.   You will know fear, trust me.   By the

11             time this shit is over, you will be wishing you just

12             ignored it.   You will fucking find out what happens

13             when you cry wolf, bitch."

14             This is an example of many of the, the graphic and,

15   frankly, alarming messages that your Honor has heard in court

16   this morning and that are in the Government's exhibits.   While

17   Mr. Cardozo did not travel physically to see Jane Doe 1, this

18   is precisely the type of crime that is, is charged in, in the

19   case.   It's cyberstalking.   It's not assault.   It's online

20   communications to threaten, to injure, and to cause fear, which

21   he very much did.

22             Your Honor, we see a number of examples in the

23   exhibits here of Mr. Cardozo's reaction to law enforcement

24   attempts to control his behavior.   Exhibit 6, his reaction to

25   Jane Doe 2's restraining order was to continue to communicate

1   with her and to talk about how the police would not be able to

2   help her.  In the communication discussing Jane Doe 3, the

3   teenage girl -- that's Exhibit 9 -- your Honor can see that

4   there's a discussion about a text message that the sheriff

5   sends using the teenage girl's phone to say, "Stop

6   communicating.  This is the sheriff."  And the response from

7   Mr. Cardozo is, "Ha, ha, police state."

8          So it's yet another example of Mr. Cardozo rejecting

9   the authority of law enforcement.  Combined, your Honor, this

10  is overall a very clear example of an individual where there'll

11  be no conditions that would be adequate to ensure both his

12  appearance and the safety of the community and thus, under

13  3142(g) the Government submits Mr. Cardozo must be detained.

14         The nature and the circumstances of his offense, as,

15  as we've discussed, goes to that.  It's not, your Honor,

16  violent in many of the traditional ways that this Court has

17  seen violence, but it is, we believe, a growing trend.  Our

18  unit has three cases of this type of cyberstalking in the last

19  year.  And again, as, as charged, it is a campaign to create

20  fear in an individual -- and a successful campaign at that -- a

21  campaign that escalated over time and a campaign that shows the

22  obsession that Mr. Cardozo had with both Jane Doe 1 and Jane

23  Doe 2 many, many years after he knew them in real life and the

24  significant impact on both of their emotional well-beings.  The

25  communications are designed to put them in fear of actual in-

1   person physical contact as well.  You know, "You will be

2   scared.  You'll be looking over your shoulder."  That online

3   communication threatens actions in the real world.

4         Your Honor, the history and the characteristics of the

5   defendant in this case also make it clear that no conditions

6   would be adequate to, to keep the community safe here, his

7   series of violent actions, long criminal history category.

8   There is no attempt by the Government, your Honor, to charge

9   this underlying conduct that occurred many years ago in Florida

10  as a sexual assault.  And so the Government is not saying that

11  that was a rape.  There is no allegation by the Government that

12  that should have been charged, but it is a lengthy discussion

13  of what was clearly an uncomfortable situation for a girl who

14  was in junior high with a senior boy.

15        And so the very fact of her describing that sexual

16  encounter appears to have triggered in the defendant some type

17  of obsessive aggression and that is what is charged, not the

18  underlying conduct.  However, your Honor, we point to the fact

19  that while the Government hasn't characterized that encounter

20  as rape, Mr. Cardozo's reaction to that essay was to contact

21  the victim and, and, as noted here, say, "I hope someone does

22  fucking rape the shit out of you for what you have done to me,

23  you fucking bitch."  That is the conduct that the Government is

24  arguing is criminal here, not the underlying assault, but

25  these, these communications, this incessant campaign against

1    Jane Doe 1 after she wrote about this experience.  He also said

2    things to the extent, "I will devote my miserable life to

3    destroying yours."  That is the conduct that's charged here and

4    that shows the nature and the history of this defendant.

5            There's also, your Honor, an extensive, as detailed in

6    both the original Pretrial Services report but most

7    significantly in the supplemental report prepared last week, a

8    history of substance abuse and suicide attempts, an individual

9    drinking since the age of 13, engaging in illegal drug use

10   since the age of 15.  This suggests a lack of stability and

11   also suggests that conditions will not adequately secure the

12   safety of, of the community.

13           Multiple examples of him failing to obey court orders,

14   four, it appears to be four involuntary commitments under the

15   Baker Act, a pattern of engaging in criminal conduct while in

16   community control.  In fact, the charged conduct here is the

17   conduct that he was under community control -- excuse me --

18   under a restraining order not to violate.  We heard about the

19   fact that the defendant's -- excuse me -- the victim's lawyers

20   contacted the probation officer and tried to have the violation

21   noted by the probation officer, but we also heard about the

22   anonymizing techniques that were used by the defendant and this

23   is the very problem.

24           So he was not able to -- the, the victims in cases

25   where they're using anonymous communications -- we've seen it

1  in this case, we've seen it in other cyberstalking cases -- are

2  not able to use traditional restraining order system because

3  they don't have the physical conduct, they don't have the

4  proof.  It's the anonymous online communications that are the

5  underlying threat here.

6          Your Honor, I, my understanding is that Ms. Peachy has

7  some inpatient treatment options that she would like to

8  propose.  The Government's position is that those would be

9  inadequate.  Those types of facilities are not designed to

10  control and monitor a dangerous defendant.  They are treatment

11  facilities.  We have seen an example here of the defendant's

12  spitting in the face of a corrections officer who was providing

13  security at a hospital treatment center.  These facilities are

14  not lockdown facilities.  Mr. Cardozo has clearly demonstrated

15  that he is unable to comply with the rules of those kinds of

16  facilities.  In the incident that's in the Government's report

17  he had been told to go back to his room.  That's what prompted

18  the spitting.  That is not an individual who can be adequately

19  cared for in an inpatient treatment facility.  And

20  significantly, your Honor, it's not a facility that can do the

21  type of Internet monitoring that this defendant seriously

22  needs.

23          So we have had three examples, your Honor, of the

24  defendant failing to comply with court orders not to contact

25  victims, even bringing up the fact that there's a restraining

1    order in the discussions with the victims, and the only way to

2    adequately assure that those victims will not continue to be

3    harassed is to have him in a facility that can prevent him from

4    using the Internet.

5           Your Honor, there have been two other cases last year

6    -- or excuse me -- in this last year in front of Judge Hennessy

7    where we discussed the same issue, cyberstalking cases, and the

8    challenges of keeping defendants away from the Internet.

9    Ultimately, the first defendant ended up conceding detention

10   after a lengthy hearing.  There was supposed to be a second

11   detention hearing and then he conceded the second one, was

12   ordered detained by Judge Hennessy, and as part of that -- it

13   was Joseph Coxtas (phonetic) is the defendant's name -- as part

14   of that decision Judge Hennessy talked about the fact that the

15   Internet is everywhere and we see that in, in many ways in many

16   kinds of cases.  The inability to prevent defendants from using

17   the Internet can be a real issue, but it's especially

18   problematic in cyberstalking cases where you have a defendant

19   who's acting obsessively, compulsively, who has an ability to

20   conceal their communications.  That, combined with the easy

21   availability of the Internet to hand-held devices to contact

22   others on the Internet, make it almost impossible to prevent a

23   defendant of any kind, but particularly a defendant of this

24   kind, from using the Internet, from accessing it, from

25   continuing his activities.

1          For all of these reasons, your Honor, the Government

2     believes that there is no conditions that would reasonably

3     assure the safety of Mr. Cardozo -- excuse me -- the appearance

4     of Mr. Cardozo and the safety of the community and we seek

5     detention.

6          THE COURT:  Thank you.

7          Ms. Peachy?

8          MS. PEACHY:  Thank you, your Honor.

9          So this is a case where the presumption of release

10    applies.  The burden is on the Government here.  They've moved

11    for detention under two grounds, that Mr. Cardozo poses a

12    serious risk of flight and also, a serious risk that he'll

13    attempt to obstruct justice and intimidate witnesses.

14         To the extent they make arguments that suggest he

15    should be detained because he's a danger, I would object that

16    that would be improper in this case with these charges.  As

17    your Honor knows, under United States v. Pluf, a First Circuit

18    case, the, an individual can only be detained in a case that's

19    described in 3142(f)(1).

20         THE COURT:  I believe that they're seeking a danger on

21    the obstruction of justice provision, which I don't think is

22    restricted, right?

23         MS. SEDKY:  That's correct, your Honor.

24         THE COURT:  Maybe -- I could be wrong.

25         MS. SEDKY:  We did not move under general

1    dangerousness --

2              THE COURT:  Right.

3              MS. SEDKY:  -- which I agree with Ms. Peachy is

4    restrictive.  We moved under a risk of flight, 3142(f)(2)(A),

5    and risk of obstruction of justice by threatening and

6    intimidating witnesses under 31(f)(2)(B) [sic].

7              MS. PEACHY:  So it's the Government's --

8              THE COURT:  So I think it's available for this charge.

9              MS. PEACHY:  I don't -- I disagree, your Honor, that,

10   that detaining him on grounds of dangerousness is available.

11             THE COURT:  Well --

12             MS. PEACHY:  I think he can only be detained on

13   grounds of serious risk of flight or serious risk of

14   obstructing justice --

15             THE COURT:  Well, I think that's --

16             MS. PEACHY:  -- or intimidating witness.

17             THE COURT:  -- what they're going on.  So --

18             MS. PEACHY:  Right, right.

19             THE COURT:  Okay.

20             MS. PEACHY:  I think with regard to risk of flight

21   Mr. Cardozo is a lifelong resident of Florida.  His parents are

22   there.  Although he's lived with both his mother and his father

23   at times, I don't think that makes him transient.  He -- at

24   this moment what we are proposing -- he has -- I can say I've

25   spoken to both of his parents and they are very supportive of

1  him in this.  What we are proposing is that Mr. Cardozo go

2  immediately into an inpatient treatment facility.  I've

3  contacted -- I've had contact with federal probation, the, in

4  West Palm Beach, Florida, the federal court there.  They

5  routinely send individuals in Mr. Cardozo's situation to a

6  Salvation Army program.  I don't know if -- I know -- I -- I --

7  I am serious.  I, I think a substance abuse program would be

8  more appropriate or a dual-diagnosis program would be more

9  appropriate for Mr. Cardozo and if the Court is so inclined, I

10  would ask for the help of, of our probation office in, in, in

11  working with the federal probation offices in South Florida to

12  see what other programs may be available.

13       To be honest, your Honor, I had trouble getting the

14  information from the federal probation offices in South

15  Florida.  I tried to contact, or someone in my office for me

16  tried to contact individual programs to see if they could tell

17  me if they work with federal probation and that also proved

18  very difficult.  So it's just not something that I was able to

19  do effectively, but I'm sure that there must be something that

20  would be appropriate for Mr. Cardozo.

21       To the --

22       THE COURT:  Why would it need to be in Florida?

23       MS. PEACHY:  Because that's where his, his parents

24  are, your Honor.  And we've learned Jane Doe No. 1 and Jane Doe

25  No. 2 are here in Massachusetts.  To the extent that there's a

1   concern about Mr. Cardozo ever having, coming in contact with

2   them, it would probably be better for everyone that he's in

3   Florida.   That's where he's from.   I mean, he's -- it's charged

4   here, my understanding is, because Jane Doe No. 1 is, is, is a

5   resident of Massachusetts.   But he has no ties here.   His ties

6   are all in Florida.

7          So I think that it makes sense for, for him to go back

8   to Florida and then when the inpatient treatment program ends,

9   he can go back, he can return to living with his father on

10  restriction, on a GPS monitoring device, for example, home

11  confinement, something like that.   As you know, you have a

12  letter from his father, who owns a plumbing supply company,

13  that he is offering his son full-time employment.   I've spoken

14  to Mr. Cardozo, Mr. Cardozo's father, about what exactly that

15  employment is.   It's not vague.   It's -- he would be working as

16  a forklift operator in the warehouse that they have there.   And

17  Probation, again, is free to call Mr. Cardozo's father --

18          THE COURT:   I have to say I -- I --

19          MS. PEACHY:   -- to confirm the employment.

20          THE COURT:   His father does not appear in this record

21  to be appropriate.   He either is aware or should have been

22  aware of a restraining order which said no firearms or he

23  should have been aware of a son who had been, had serious

24  mental health issues and had been put in facilities several

25  times, as I'm understanding it, for involuntary commitment and

1  yet pursued the firearm --

2          MS. PEACHY:  Going to the shooting range, right.

3          THE COURT:  -- shooting with him.

4          MS. PEACHY:  Well, his mother --

5          THE COURT:  I'm not sure that that's an appropriate

6  response --

7          MS. PEACHY:  His -- his --

8          THE COURT:  -- to the situation.

9          MS. PEACHY:  His, his parents don't live together.

10  They've been separated for a long time.  His mother is now

11  staying with a sister in Georgia because of the attack on

12  Mr. Cardozo that happened at her apartment.  They were --

13  Mr. Cardozo was living with her at the time.  That has put her

14  in significant fear of these investigators that have been, that

15  were hired by Jane Doe.

16          So she's now living in Georgia, but she does intend to

17  eventually move back to Florida.  She is somewhat apprehensive

18  about Mr. Cardozo coming back to live with her because she's

19  afraid that these investigators will come back.  So it's, it's

20  put Mr. Cardozo in a very difficult situation with his family

21  where his family is now in fear.

22          THE COURT:  So the problem that I'm having with that

23  is that he's been living with his family on and off for many

24  years.  These e-mails have been going on for many years.  The

25  restraining orders have been going on for many years and it

1   does not seem on this record that these individuals have

2   sufficient control over him to ensure compliance with any court

3   order.

4          MS. PEACHY:  Well, I think what can be done is that

5   Mr. Cardozo can be prohibited from using a computer, from any

6   Internet-capable device --

7          THE COURT:  He's been ordered --

8          MS. PEACHY:  -- that --

9          THE COURT:  -- a number of times to have no contact

10  and that --

11         MS. PEACHY:  But --

12         THE COURT:  -- doesn't seem to have worked.

13         MS. PEACHY:  But the -- because the con -- we're

14  talking about contact which is exclusively confined to the

15  Internet.  It's -- we're not talking about phone contact.

16  We're not, definitely not talking about any in-person contact

17  or even an attempt to have in-person contact.  We're talking

18  about using the Internet.  If you take the Internet away, which

19  federal probation is capable of doing, capable of monitoring --

20  we do, they do it in other cases -- then you remove the means

21  by which he has had all of these unlawful communications over

22  the years.

23         So I think that that would be an appropriate condition

24  to address the concerns that he will try to intimidate

25  witnesses or obstruct justice at this point.

1       As far as risk of flight, I don't think that's as much

2 of a concern because he's never, there's no allegation that

3 he's ever fled from court -- from -- from court.  He can be put

4 on a GPS monitoring device.  He can be put in an inpatient

5 treatment program.  We can restrict his travel to the State of

6 Florida, even though there's no evidence that he's ever tried

7 to actually leave Florida.  His family, as I said, is in

8 Florida.  That's where he was born and raised.

9       These comments that Mr. Cardozo made, I've tried to

10 put them in some context and I'm not necessarily excusing them.

11 They're nasty comments, to say the least, but as you heard,

12 Mr. Cardozo had very tame, normal, so to speak, communications

13 with Jane Doe No. 1 before she published this essay and then

14 she publishes this essay in which she characterizes him

15 basically as a rapist and he has this reaction.  I mean, I'm

16 not equating it, but just yesterday we saw probably our next

17 Supreme Court Justice get very enraged over a similar type of

18 accusation made against him.  Then she hires --

19       THE COURT:  But he has no e-mails.

20       MS. PEACHY:  Then she hires this vigilante private

21 investigator who follows him.  She tries -- instead of going to

22 the police, she goes to his probation officer to try to get him

23 incarcerated.  This private investigator follows him, follow,

24 knocks on neighbors' doors, speaks to, contacts his mother and

25 father.  They detain the Uber driver that just dropped

1    Mr. Cardozo off, then the next day after bonding out -- the

2    exhibits will show this -- after bonding out this private

3    investigator that she hires goes to Mr. Cardozo's apartment and

4    tries to kill him, beat, beats him to a bloody pulp where he

5    has a fractured orbital bone and requires surgery.  And many of

6    the comments that come after that about -- that reference --

7    where, where he's referencing $8,000 in surgery bills to Jane

8    Doe No. 1, that's where that's coming from.

9            THE COURT:  I understand the --

10           MS. PEACHY:  So I'm not saying they don't cross the

11   line, but they, they need to be put in, in context.  They are

12   not entirely out of the blue.

13           THE COURT:  I, I recognize that and I think that that

14   is more than an unfortunate situation, but those are June of

15   2018.  I mean, I -- if I'm reading this correctly, that's June

16   of 2018, which means that for years these victims have been

17   driven to, in a state of fear of living with this from someone

18   who has exhibited violent tendencies and who has exhibited an

19   ability to hide his identity.

20           I don't have a problem with Probation spending some

21   time talking to Florida.  For present purposes, I find that

22   there's a significant risk of flight and there's a significant

23   risk of obstruction of justice and he will be detained.

24           I, I find his inability to comply with any court

25   orders and clearly inability to comply with his probation

1   officer's instructions, presumably down in Florida -- he's on

2   probation and he's still sending these very, very scary

3   communications -- leads me with no choice to believe that he

4   cannot comply with conditions of release.

5         That having been said, he clearly has a serious

6   emotional problem with this situation and, perhaps, a drug

7   problem.  I don't know.

8         You are free to work with Probation to explore

9   alternatives and you may seek to reopen this if there, if you

10  have a proposal later, but his parents as third-party

11  custodians on the record that I have now is not appropriate,

12  all right?  And you can always seek to reopen that.

13        But right now, I don't feel that I have a choice and

14  right now, I know in Massachusetts I don't have a lockdown

15  mental health alternative.  I don't know what they have in

16  Florida and I don't know how to put him in a facility and

17  ensure no access to Internet capabilities, all of which if you

18  have an alternative for me, I will consider it.  But for

19  present purposes, he will be detained, all right?

20        Is there anything further on this matter?

21        MS. SEDKY:  Nothing, your Honor.

22        MS. PEACHY:  No, your Honor.

23        THE COURT:  Okay.  Thank you.

24     (Proceedings concluded at 1:03 p.m.)

25

1                          <u>CERTIFICATE</u>

2          I, court approved transcriber, certify that the

3   foregoing is a correct transcript from the official electronic

4   sound recording of the proceedings in the above-entitled

5   matter.

6   /s/ *Janice Russell*                    October 11, 2018

7   Janice Russell, Transcriber                 Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25